No. 26-5362

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COMMON CAUSE, ET AL.,

*Plaintiffs - Appellees,*

v.

U.S. DEPARTMENT OF JUSTICE, ET AL.,

*Defendants - Appellants.*

On Appeal from the United States District Court for the District of Columbia

# BRIEF OF BIPARTISAN CURRENT AND FORMER MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND IN OPPOSITION TO A STAY PENDING APPEAL

JOSHUA MATZ
TRISHA ANDERSON
TAISA M. GOODNATURE
HECKER FINK LLP
1050 K Street NW,
10th Floor
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com

*Counsel for* Amici Curiae

November 23, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici:

Except for *Amici Curiae* Bipartisan Current and Former Members of Congress, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Parties' Certificates as to Parties, Rulings, and Related Cases.

### B. Rulings Under Review:

References to the rulings at issue appear in the Parties' Certificates as to Parties, Rulings, and Related Cases.

### C. Related Cases:

This case has not previously been before this Court. Counsel for *Amici* are not aware of any related cases.

/s/ Joshua Matz
Joshua Matz

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ i

TABLE OF AUTHORITIES ........ iii

INTEREST OF *AMICI CURIAE* ........ 1

INTRODUCTION & SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 4

I. The Administration Is Not Likely to Succeed in Showing It Complied with the Privacy Act ........ 4

A. Debates from the 1950s to the 1970s Led to Strong Opposition to a National Data Bank ........ 4

B. Congress Passed the Privacy Act in 1974 to Prohibit a Program like the Voter List Maintenance Policy ........ 9

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

### CASES

*Common Cause v. U.S. Dep't of Just.*,
--- F. Supp. 3d ----, No. 26 Civ. 1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) .......... 2, 10-11, 13

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 3

*Sampson v. Murray*,
415 U.S. 61n.2 (1974) .......... 3

### FEDERAL STATUTES

5 U.S.C. § 552a(b) .......... 1

5 U.S.C. § 552a(e)(5) .......... 12

5 U.S.C. § 552a(e)(6) .......... 12

5 U.S.C. § 552(e)(4)(D) .......... 11

5 U.S.C. § 552(e)(11) .......... 11

Privacy Act of 1974, § 2(b)(2), 88 Stat. 1896 (Dec. 31, 1974) .......... 10

### LEGISLATIVE MATERIALS

120 Cong. Rec. H36,664 (daily ed. Nov. 20, 1974) .......... 10

120 Cong. Rec. S36,916 (daily ed. Nov. 21, 1974) .......... 12

*Computer Privacy: Hearings Before the Subcomm. on Admin. Prac. & Proc. of the S. Comm. on the Judiciary*, 90th Cong. (1967) .......... 8

*Federal Data Banks, Computers and the Bill of Rights: Hearings Before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary*, 92d Cong. (1971) .......... 9

H. Comm. on Gov't Operations, 89th Cong., *The Computer and Invasion of Privacy* (1966) .......... 5-9

S. Comm. on Gov't Operations & H. Comm. on Gov't Operations, 94th Cong., *Source Book on Privacy* (Joint Comm. Print 1976) ........ 3, 5, 10-12

Subcomm. on Const. Rts. of the S. Comm. on the Judiciary, 93d Cong., *Federal Data Banks and Constitutional Rights* (Comm. Print 1974)) ........ 4-5,7

S. Rep. No. 93-1183 (1974) ........ 3

**OTHER AUTHORITIES**

Edgar S. Dunn, Jr., *Statistical Evaluation Report No. 6—Review of Proposal for a National Data Center* (Nov. 1, 1965) ........ 6-7

*Government Information and the Rights of Citizens*, 73 Mich. L. Rev. 971 (1975) ........ 12

Jerome Hanus, Cong. Rsch. Serv., *Citizen Access to Records: A Guide to Federal Statutory Requirements* (1976) ........ 5

Carl Kaysen, *Data Banks and Dossiers*, The Pub. Int. (Spring 1967) ........ 8

James T. Lynn, Dir., Off. of Mgmt. & Budget, *Implementation of the Privacy Act of 1974* (Nov. 21, 1975) ........ 11

*Report of the Committee on the Preservation and Use of Economic Data to the Social Science Research Council* (Apr. 1965) ........ 5-6

*To Preserve Privacy*, N.Y. Times (Aug. 9, 1966) ........ 8

## INTEREST OF *AMICI CURIAE*

*Amici* are current and former Members of Congress who share a commitment to upholding personal privacy, security, and election integrity and who recognize the ongoing vitality of the Privacy Act of 1974. As members of the Legislative Branch, *Amici* have strong interests in the interpretation of federal law. A complete list of *Amici* is set forth in the appendix to this brief.[1]

## INTRODUCTION & SUMMARY OF ARGUMENT

The Privacy Act of 1974 embodies Congress's longstanding recognition that the decentralization of information about individuals held by different federal agencies is an essential bulwark against the invasion of Americans' fundamental rights. Put simply, the Act creates a presumption that the records an agency obtains or creates about an individual remain within that agency. *See* 5 U.S.C. § 552a(b).

As the district court correctly held, the Voter List Maintenance Policy at issue here runs roughshod over the Privacy Act's protections.

---

[1] *Amici* state that no counsel for a party authored this brief in whole or in part and that no person or entity other than *Amici* or their counsel made a monetary contribution to fund its preparation and submission. All parties have consented to the filing of this brief.

*See Common Cause v. U.S. Dep't of Just.*, --- F. Supp. 3d ----, No. 26 Civ. 1352, 2026 WL 3033772, at *27-35 (D.D.C. Oct. 9, 2026) ("District Court Op."). By demanding states' unredacted voter registration lists; disseminating them to the Department of Homeland Security to run through a flawed database containing inaccurate citizenship information for *millions* of Americans; and sending the results back to the states to "clean" their voter rolls based on that inaccurate data—not to mention sharing the lists of registered voters with Immigration and Customs Enforcement (ICE) and potentially even private contractors—the Department of Justice violated at least four substantive and procedural provisions of the Privacy Act. *See id.* at *4-7, 28-34.

The context in which the Privacy Act was enacted underscores the district court's conclusion. As recounted below, the federal government sought repeatedly in the mid-twentieth century to create a centralized national data bank of the electronic records that different federal agencies possess about individuals. These efforts, even when high minded, provoked fierce and steadfast opposition by Congress and the public. Opponents of such proposals saw that the centralization of records about individuals would significantly erode personal privacy and

potentially pave the way for an Orwellian "Big Brother" state. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 96 n.2 (1974) (Douglas, J., dissenting) (remarking upon "congressional concern" that "we live in an Orwellian age in which the computer has become the heart of a national surveillance system" (citation modified)).

Congress concluded that legislation was needed to put an end to such proposals. It passed the Privacy Act of 1974 to directly prevent "the creation of formal or de facto national data banks, or of centralized Federal information systems without certain statutory guarantees." S. Rep. No. 93-1183, at 15 (1974), *reprinted in* S. Comm. on Gov't Operations & H. Comm. on Gov't Operations, 94th Cong., *Source Book on Privacy* 168 (Joint Comm. Print 1976) ("Source Book"). This context makes clear why the Administration is not likely to succeed and why its emergency application should be denied. *See Fischer v. United States*, 603 U.S. 480, 498 (2024) ("declin[ing] to adopt [an] interpretation" that "is inconsistent with 'the context from which the statute arose'" (citation omitted)).

## ARGUMENT

### I. The Administration Is Not Likely to Succeed in Showing It Complied with the Privacy Act.

The Voter List Maintenance Policy implicates the core concerns that led Congress to enact the Privacy Act. By combining state voter registration lists obtained by the Department of Justice with inaccurate data collected and maintained by other federal agencies for disparate purposes to disenfranchise U.S. citizens, the Policy echoes the very data centralization proposals that Congress decisively rejected over fifty years ago when it passed the Act.

#### A. Debates from the 1950s to the 1970s Led to Strong Opposition to a National Data Bank.

The roots of the Privacy Act stretch back several decades before its enactment. As federal programs expanded during the New Deal, so too did the volume and nature of data that federal agencies collected and maintained about individuals. *See* Subcomm. on Const. Rts. of the S. Comm. on the Judiciary, 93d Cong., *Federal Data Banks and Constitutional Rights* 3 (Comm. Print 1974). In the 1930s and 1940s, however, the analog format of these records limited the government's capacity to store and analyze them. "[D]ata could not be kept for long periods by Government agencies, since room had to be made for the

continuous inflow of new punchcards." *Report of the Committee on the Preservation and Use of Economic Data to the Social Science Research Council* (Apr. 1965) ("Ruggles Rep."), *reprinted in* H. Comm. on Gov't Operations, 89th Cong., *The Computer and Invasion of Privacy* 199 (1966).

The mid-century arrival of the computer rapidly eroded such practical limitations on the government's ability to collate and analyze data about individuals. The public quickly recognized the resulting threat to individual privacy and freedom. By the mid-1960s, "[f]ederal files contained more than three billion records on individual citizens," including "264.5 million criminal histories, 279.6 million mental health records, 916.4 million profiles on alcoholism and drug addiction, and over 1.2 billion financial records." *Federal Data Banks and Constitutional Rights*, *supra*, at 10. Increasingly, these records were retrievable by computer. *Id.*; *see also id.* at 33. Absent legislative guardrails, the proliferation of digital records "lent substance to the worries of many that the nation's tradition of limited government was in jeopardy." Jerome Hanus, Cong. Rsch. Serv., *Citizen Access to Records: A Guide to Federal Statutory Requirements* (1976), *reprinted in* Source Book 1295.

These concerns erupted in public when the federal government's plans to establish a national data bank became known. In April 1965, a committee of social scientists led by economist Richard Ruggles produced a report—the Ruggles Report—bemoaning the "highly decentralized" nature of the federal statistical system, which made it "extremely difficult . . . to find out what data exist[ed] on various topics and how to obtain access to them." Ruggles Rep. 197, 201. The Ruggles Report recommended that the Bureau of the Budget (now known as the Office of Management and Budget) "immediately take steps to establish a Federal Data Center," which would "have the authority to obtain computer tapes and other machine readable data produced by all Federal agencies." *Id.* at 195.

The Ruggles Report was followed by the Dunn Report, authored by economist Edgar S. Dunn, Jr., which the Bureau of the Budget commissioned "to examine the proposal" set forth in the Ruggles Report and "study ways of implementing it." Edgar S. Dunn, Jr., *Statistical Evaluation Report No. 6—Review of Proposal for a National Data Center* (Nov. 1, 1965), *reprinted in The Computer and Invasion of Privacy*, *supra*, at 254. In Dunn's view, the "key to solving" the problems that the Ruggles

Report had first identified was the establishment of a National Data Service Center with comprehensive "file management and utilization services." *Id.* at 266.

The Dunn Report was published in 1965 and went off like a hand grenade. Its data bank proposal was "labeled in the press, and before Congress, as a giant step towards centralization of power, de-personalization, and realization of the totalitarian society . . . Orwell portrayed in his novel, *1984*." *Federal Data Banks and Constitutional Rights*, *supra*, at 4.

In July 1966, the House Special Subcommittee on Invasion of Privacy convened hearings on "The Computer and Invasion of Privacy." *The Computer and Invasion of Privacy*, *supra*, at 1. Chairman Cornelius E. Gallagher opened with a warning that, without proper vigilance, Americans might "awaken some morning in the future and find that the dossier bank is an established fact, and that liberty as we knew it vanished overnight." *Id.* at 3. During these hearings, Vance Packard, bestselling author of *The Naked Society*, offered a striking warning: "My own hunch is that Big Brother, if he ever comes to these United States,

may turn out to be not a greedy power seeker, but rather a relentless bureaucrat obsessed with efficiency." *Id.* at 13.

Public opposition to the national data center proposal swelled in the wake of these hearings. On August 9, 1966, for example, the *New York Times* published an editorial warning that "[t]he Orwellian nightmare" depicted in *1984* "would be brought very close indeed if Congress permit[ted] the proposed computer National Data Center to come into being." *To Preserve Privacy*, N.Y. Times (Aug. 9, 1966), *reprinted in The Computer and Invasion of Privacy*, *supra*, at 317-18.

Meanwhile, the Bureau of the Budget had appointed a task force chaired by Carl Kaysen, an economist and former White House national security official, to consider "measures which should be taken to improve the storage of and access to U.S. Government statistics." *The Computer and Invasion of Privacy*, *supra*, at 50 (internal quotation marks omitted). But the privacy-centered "public outcry which the Committee hearings" started created headwinds too strong for the task force to overcome. Carl Kaysen, *Data Banks and Dossiers*, The Pub. Int. (Spring 1967), *reprinted in Computer Privacy: Hearings Before the Subcomm. on Admin. Prac. & Proc. of the S. Comm. on the Judiciary*, 90th Cong. 266 (1967).

Ultimately, and as remains relevant today, "it was determined that a National Data Bank was not in the best interests of the American people and the . . . proposal [was] effectively buried." *Federal Data Banks, Computers and the Bill of Rights: Hearings Before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary*, 92d Cong. 1566 (1971).

### B. Congress Passed the Privacy Act in 1974 to Prohibit a Program like the Voter List Maintenance Policy.

It became clear that legislation was necessary to protect Americans from the privacy threats inherent in federal agencies' centralization of sensitive personal information. As law professor Charles A. Reich had advised during the 1966 House hearings, "real protection in this world comes not from people's good intentions but from the law." *The Computer and Invasion of Privacy*, *supra*, at 31. In particular, he called on Congress to pass a law ensuring that information "needed for one particular . . . agency . . . go[es] to no one else." *Id.* at 32.

Congress responded by passing the Privacy Act of 1974, which imposed substantive and procedural guardrails on the Executive's use of records about individuals. To maintain decentralized records while allowing the government some flexibility in record sharing to account for legitimate agency needs, the Privacy Act deploys several protections—

including, as relevant here (because the Administration has failed to comply with it), the "routine use" provision. As Congressman Moorhead explained, the purpose of prohibiting non-routine transfers was to "make it legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen." 120 Cong. Rec. H36,664 (daily ed. Nov. 20, 1974) (statement of Rep. Moorhead), *reprinted in* Source Book 884.

Congress thus saw the routine use provision as furthering the Act's purpose by "permit[ting] an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent." Privacy Act of 1974, § 2(b)(2), 88 Stat. at 1896. As the district court here determined, the Voter List Maintenance Policy does not comply with that settled reading of the provision. *See* District Court Op., 2026 WL 3033772, at *29-31.

The Privacy Act also includes a procedural dimension to the routine use provision to guard against the possibility that executive agencies would abuse the cabined flexibility that the provision allowed. Believing that public transparency would provide an important accountability

check, Congress required agencies to publish each routine use of records, "including . . . the purpose of such use," in the Federal Register at least 30 days in advance of any new use and to provide an opportunity for comment. 5 U.S.C. § 552a(e)(4)(D), (e)(11). The notice-and-comment requirement thus complemented the central routine use requirement by "deter[ring] promiscuous use of th[e] concept" through transparency and public accountability. James T. Lynn, Dir., Off. of Mgmt. & Budget, *Implementation of the Privacy Act of 1974* (Nov. 21, 1975), *reprinted in* Source Book 1131. By relying on a reading of the routine use exception that "defies belief," District Court Op., 2026 WL 3033772, at *28-29, instead of undertaking notice and comment, the government has failed to provide the public transparency that is needed for the provision to perform the accountability function that Congress envisioned.

Congress similarly did not intend for the Privacy Act's narrow exception for law enforcement activity to permit the kind of wholesale and indiscriminate sharing of records that occurs under the Voter List Maintenance Policy. Indeed, the requirement that agencies rule on each request for a "particular portion" of a record "on a case-by-case basis," *id.* at *32 (citations omitted), was understood by Congress and the public to

"prevent[] law enforcement agencies from going on 'fishing expeditions,'" *Government Information and the Rights of Citizens*, 73 Mich. L. Rev. 971, 1326 (1975), *reprinted in* Source Book 1358—which is precisely what happens when the Department of Justice disseminates a list of *all* registered voters in a state to the Department of Homeland Security.

The Privacy Act also guards against the deprivation of rights—here, the fundamental right to vote—based on inaccurate or stale information, by requiring federal agencies to "maintain all records which are used by the agency in making any determination about any individual with such accuracy . . . as is reasonably necessary to assure fairness to the individual in the determination," 5 U.S.C. § 552a(e)(5), and to "make reasonable efforts to assure that such records are accurate" before "disseminating" them outside the federal government, *id.* § 552a(e)(6).

As Senator Ribicoff observed during floor debate on the Privacy Act, "decisions affecting people's lives" are made based on the files that the government maintains on individuals, often "contain[ing] information of a most personal nature." 120 Cong. Rec. S36,916 (daily ed. Nov. 21, 1974) (statement of Sen. Ribicoff), *reprinted in* Source Book 835-36. As the

government collected and maintained increasing volumes of data using computer technology, however, this information was too often "outdated and incorrect." *Id.* at 836. The resulting errors took "a large and unmeasured toll . . . on the constitutional principles of accountability, responsibility, and limited government." *Id.* By using severely flawed citizenship information to prevent citizens from voting, the Department of Justice violated the Act's accuracy requirements and deprived Americans of their fundamental rights based on inaccurate information. *See* District Court Op., 2026 WL 3033772, at *32-33. Congress unequivocally prohibited such conduct through the Privacy Act.

*  *  *

As this history reflects, the context of the Privacy Act evinces an unmistakable congressional decision to prevent an unauthorized data-sharing program like the Voter List Maintenance Policy. Congress foresaw that the Executive Branch might continue to assert that efficiency, economy, or security should prevail against this legislative judgment on individual privacy and freedom—so it wrote substantive and procedural rules meant to fix legal limits around the Executive. To grant

the Administration's request for a stay would eviscerate those legal limits and destroy the individual rights secured by statute.

## CONCLUSION

The Court should deny the Administration's emergency motion for a stay pending appeal.

Respectfully Submitted,

/s/ Joshua Matz
JOSHUA MATZ
TRISHA ANDERSON
TAISA M. GOODNATURE
HECKER FINK LLP
1050 K Street NW,
10th Floor
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com

*Counsel for* Amici Curiae

Dated: November 23, 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2,567 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Joshua Matz
Joshua Matz

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2026, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the D.C. Circuit using the CM/ECF system, which will send notice to all counsel who are registered CM/ECF users.

/s/ Joshua Matz
Joshua Matz

## CERTIFICATE AS TO SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), this separate brief is necessary because it addresses an issue of particular significance to *Amici*, namely, the proper interpretation of the Privacy Act of 1974 as it applies to the Voter List Maintenance Policy at issue in this appeal. As current and former members of the Legislative Branch, *Amici* are uniquely well suited to provide the Court with this important context.

/s/ Joshua Matz
Joshua Matz

# APPENDIX

## LIST OF *AMICI CURIAE*

**Current Members of the U.S. House of Representatives**

1. **Jamie Raskin**
   Representative of Maryland
2. **Joseph D. Morelle**
   Representative of New York
3. **Robert Garcia**
   Representative of California
4. **Bennie G. Thompson**
   Representative of Mississippi
5. **Hakeem Jeffries**
   Representative of New York
6. **Katherine Clark**
   Representative of Massachusetts
7. **Pete Aguilar**
   Representative of California
8. **Joe Neguse**
   Representative of Colorado
9. **Gabe Amo**
   Representative of Rhode Island
10. **Yassamin Ansari**
    Representative of Arizona
11. **Jake Auchincloss**
    Representative of Massachusetts
12. **Becca Balint**
    Representative of Vermont

13. **Nanette Barragán**
Representative of California

14. **Wesley Bell**
Representative of Missouri

15. **Ami Bera, M.D.**
Representative of California

16. **Donald S. Beyer Jr.**
Representative of Virginia

17. **Brendan F. Boyle**
Representative of Pennsylvania

18. **Shontel Brown**
Representative of Ohio

19. **Julia Brownley**
Representative of California

20. **Nikki Budzinski**
Representative of Illinois

21. **Salud O. Carbajal**
Representative of California

22. **André Carson**
Representative of Indiana

23. **Troy A. Carter, Sr.**
Representative of Louisiana

24. **Sean Casten**
Representative of Illinois

25. **Judy Chu**
Representative of California

26. **James E. Clyburn**
Representative of South Carolina

27. **Steve Cohen**
Representative of Tennessee

28. **Herbert C. Conaway, Jr.**
Representative of New Jersey

29. **J. Luis Correa**
Representative of California

30. **Joe Courtney**
Representative of Connecticut

31. **Jasmine Crockett**
Representative of Texas

32. **Jason Crow**
Representative of Colorado

33. **Danny K. Davis**
Representative of Illinois

34. **Madeleine Dean**
Representative of Pennsylvania

35. **Diana DeGette**
Representative of Colorado

36. **Suzan K. DelBene**
Representative of Washington

37. **Chris Deluzio**
Representative of Pennsylvania

38. **Lloyd Doggett**
Representative of Texas

39. **Sarah Elfreth**
Representative of Maryland

40. **Veronica Escobar**
Representative of Texas

41. **Adriano Espaillat**
Representative of New York

42. **Dwight Evans**
Representative of Pennsylvania

43. **Lizzie Fletcher**
Representative of Texas

44. **Bill Foster**
Representative of Illinois

45. **Lois Frankel**
Representative of Florida

46. **Laura Friedman**
Representative of California

47. **Maxwell Alejandro Frost**
Representative of Florida

48. **John Garamendi**
Representative of California

49. **Jesús G. “Chuy” García**
Representative of Illinois

50. **Sylvia Garcia**
Representative of Texas

51. **Maggie Goodlander**
Representative of New Hampshire

52. **Al Green**
Representative of Texas

53. **Adelita Grijalva**
Representative of Arizona

54. **Pablo José Hernández Rivera**
Representative of Puerto Rico

55. **Steven Horsford**
Representative of Nevada

56. **Steny H. Hoyer**
Representative of Maryland

57. **Glenn F. Ivey**
Representative of Maryland

58. **Jonathan L. Jackson**
Representative of Illinois

59. **Henry C. "Hank" Johnson, Jr.**
Representative of Georgia

60. **Julie Johnson**
Representative of Texas

61. **Sydney Kamlager-Dove**
Representative of California

62. **Timothy M. Kennedy**
Representative of New York

63. **Ro Khanna**
Representative of California

64. **Raja Krishnamoorthi**
Representative of Illinois

65. **Summer L. Lee**
Representative of Pennsylvania

66. **Teresa Leger Fernández**
Representative of New Mexico

67. **Ted W. Lieu**
Representative of California

68. **Zoe Lofgren**
Representative of California

69. **Stephen F. Lynch**
Representative of Massachusetts

70. **Lucy McBath**
Representative of Georgia

71. **April McClain Delaney**
Representative of Maryland

72. **James P. McGovern**
Representative of Massachusetts

73. **LaMonica McIver**
Representative of New Jersey

74. **Gregory W. Meeks**
Representative of New York

75. **Analilia Mejia**
Representative of New Jersey

76. **Robert J. Menendez**
Representative of New Jersey

77. **Grace Meng**
Representative of New York

78. **Dave Min**
Representative of California

79. **Seth Moulton**
Representative of Massachusetts

80. **Jerrold Nadler**
Representative of New York

81. **Richard E. Neal**
Representative of Massachusetts

82. **Eleanor Holmes Norton**
Representative of the District of Columbia

83. **Johnny Olszewski**
Representative of Maryland

84. **Nancy Pelosi**
Representative of California

85. **Brittany Pettersen**
Representative of Colorado

86. **Stacey E. Plaskett**
Representative of the Virgin Islands

87. **Delia C. Ramirez**
Representative of Illinois

88. **Emily Randall**
Representative of Washington

89. **Deborah K. Ross**
Representative of North Carolina

90. **Andrea Salinas**
Representative of Oregon

91. **Mary Gay Scanlon**
Representative of Pennsylvania

92. **Bradley Scott Schneider**
Representative of Illinois

93. **Terri A. Sewell**
Representative of Alabama

94. **Brad Sherman**
Representative of California

95. **Lateefah Simon**
Representative of California

96. **Adam Smith**
Representative of Washington

97. **Eric Sorensen**
Representative of Illinois

98. **Melanie A. Stansbury**
Representative of New Mexico

99. **Greg Stanton**
Representative of Arizona

100. **Suhas Subramanyam**
Representative of Virginia

101. **Mark Takano**
Representative of California

102. **Shri Thanedar**
Representative of Michigan

103. **Mike Thompson**
Representative of California

104. **Rashida Tlaib**
Representative of Michigan

105. **Paul D. Tonko**
Representative of New York

106. **Ritchie Torres**
Representative of New York

107. **Lori Trahan**
Representative of Massachusetts

108. **Derek T. Tran**
Representative of California

109. **Juan Vargas**
Representative of California

110. **James Walkinshaw**
Representative of Virginia

111. **Maxine Waters**
Representative of California

112. **Nikema Williams**
Representative of Georgia

113. **Frederica S. Wilson**
Representative of Florida

**Former Members of the U.S. House of Representatives**

1. **Steve Bartlett**
Representative of Texas, 1983-1991

2. **Charles W. Boustany, Jr.**
Representative of Louisiana, 2005-2017

3. **Barbara J. Comstock**
Representative of Virginia, 2015-2019

4. **Mickey Edwards**
Representative of Oklahoma, 1977-1993

5. **David F. Emery**
Representative of Maine, 1975-1983

6. **Wayne T. Gilchrest**
Representative of Maryland, 1991-2009

7. **James C. Greenwood**
Representative of Pennsylvania, 1993-2005

8. **Steve Gunderson**
Representative of Wisconsin, 1981-1997

9. **John LeBoutillier**
Representative of New York, 1981-1983

10. **Susan Molinari**
Representative of New York, 1990-1997

11. **Claudine Schneider**
Representative of Rhode Island, 1981-1991

12. **Christopher H. Shays**
Representative of Connecticut, 1987-2009

13. **Peter P. Smith**
Representative of Vermont, 1989-1991

14. **David A. Trott**
Representative of Michigan, 2015-2019